REGINALD D. STEER (SBN 56324)
AMIT KURLEKAR (SBN 244230)
**AKIN GUMP STRAUS HAUER & FELD LLP**
580 California Street, 15th Floor
San Francisco, California 94104-1036
Telephone:   415-765-9500
Facsimile:   415-765-9501
Email:       RSteer@AkinGump.com

Attorneys for Plaintiffs
VALENT U.S.A. CORPORATION
and SUMITOMO CHEMICAL COMPANY, LTD.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

(SAN FRANCISCO DIVISION)

| | |
|---|---|
| VALENT U.S.A. CORPORATION and SUMITOMO CHEMICAL CO., LTD., <br><br> Plaintiffs, <br><br> v. <br><br> SYNGENTA CROP PROTECTION, INC., <br><br> Defendant. | **CASE NO. 08-CV-0720 VRW** <br><br> **DECLARATION OF MOTOHARU MORIYA IN SUPPORT OF PLAINTIFFS' RESPONSE TO SYNGENTA'S MOTION TO DISMISS THE COMPLAINT** <br><br> Hearing Date:   June 26, 2008 <br> Hearing Time:   2:30 p.m. <br> Courtroom:   Courtroom 6, 17th floor |

I, Motoharu Moriya, hereby declare as follows:

1. I am the General Manager for the Latin America Division and Global Business Development Manager for Valent U.S.A. Corporation ("Valent"), a wholly owned subsidiary of Plaintiff Sumitomo Chemical Company, Limited ("SCC") (collectively "Plaintiffs"). My business address is 1600 Riviera Avenue Suite 200, Walnut Creek, CA 94596. I reside in California.

2. From April 2006 until May 1, 2008, I was the Business Planning Manager for SCC working within the Business Planning and Administration Department of the Crop Protection Division – International, located in Tokyo, Japan.

3. My work as Business Planning Manager at SCC was focused primarily on developing international business opportunities for crop protection products, which include SCC's chemical insecticides.

1

SUPPORTING DECLARATION OF MOTOHARU MORIYA                    Case No. 08-CV-0720 VRW

4. I was employed from March 2002 to March 2006 in the position of Director of Planning at Valent in Walnut Creek, California.

5. I received a bachelor's degree in Allied Services from the University of Hartford, located in West Hartford, Connecticut in 1989.

6. I make this declaration in support of Plaintiffs' Opposition to Syngenta's Motion to Dismiss the Complaint and Plaintiffs' Motion for Expedited Discovery. The facts stated in this declaration are based on my own knowledge except where otherwise stated, and if called upon to do so, I can and will testify to them.

## I.    PLAINTIFFS' PLANS TO SELL CLOTHIANIDIN

7. Valent and SCC intend to begin making and offering to sell in the United States the agricultural chemical clothianidin, a neonicotinoid insecticide, in December 2008 for use on treatment of seeds, a major portion of which is seeds of genetically engineered plants. Clothianidin is a commercially important insecticide because it is effective against a wide range of insects. SCC and Valent have been moving forward diligently to complete its business preparations to allow them to begin offering clothianidin for sale in the U.S. for treatment of seeds, including seeds of genetically engineered plants. These preparations have been substantial and continuous, and include contracting for toll formulating (or manufacturing), applying clothianidin to plants and seeds, including genetically engineered plants and their seeds in U.S. field trials that began in 2005 and are continuing in 2008, and preparing and filing in 10 states for pesticide registrations that would authorize the application of SCC's clothianidin products to plants and seeds, including genetically engineered plants and their seeds.

8. In 2002, SCC entered into an arrangement with Takeda Pharmaceuticals ("Takeda") of Japan, whereby SCC contracted to acquire the agricultural-chemical portion of Takeda after a five year joint venture. As part of this arrangement, from November 2002 until November 2007, SCC and Takeda operated a joint venture known as Sumitomo Chemical Takeda Agro Company ("Sumitake"). In November 2007, the Sumitake joint venture was merged into SCC. Throughout the remainder of this declaration, I will refer to Sumitake, SCC, and Valent as "SCC," because one or more of these entities performed the activities I describe.

2

SUPPORTING DECLARATION OF MOTOHARU MORIYA                    Case No. 08-CV-0720 VRW

9. The Takeda acquisition included U.S. Patent No. 5,034,404 ("the '404 patent"). The '404 patent claims clothianidin, an insecticidal compound that was invented by Takeda's scientists. Pursuant to the terms of a pre-existing agreement between Bayer CropScience AG, formerly Bayer AG, ("Bayer") and Takeda, Bayer will enjoy exclusive rights to clothianidin sales for the treatment of seeds in the United States until November 2008, except for certain plants where the date was extended one year. Upon the expiration of Bayer's exclusive rights, SCC will toll formulate and sell clothianidin in the United States for use on treatment of seeds, including seeds of genetically engineered plant.

10. After the 2002 transaction with Takeda, SCC began preparations for U.S. sales of clothianidin. These preparations, including field testing, have been substantial, continuous, and time consuming. Field testing involves formulation and application of clothianidin to selected plants, including genetically engineered plants, and their seeds in selected parts of the United States. A complete cycle for evaluation of a field test typically takes two years. Any knowledgeable industry participant, such as Syngenta, knows that this procedure is followed prior to offering a new insecticide product for sale.

11. SCC's preparations included at least the following activities:

a.  In 2005 SCC field tested clothianidin on genetically engineered cotton in six states.

b.  In 2006 SCC field tested clothianidin on genetically engineered canola in two states, on genetically engineered corn in twelve states, on genetically engineered cotton in nine states, on genetically engineered soybeans in eight states, and on genetically engineered sugar beets in one state.

c.  In 2007 SCC field tested clothianidin on genetically engineered canola in two states, on genetically engineered corn in fourteen states, on genetically engineered cotton in nine states, and on genetically engineered soybeans in eight states.

d.  In 2008 SCC is field testing clothianidin on genetically engineered canola in two states, on genetically engineered corn in fifteen states, on genetically engineered soybeans in ten states, and on genetically engineered cotton in five states.

e.  In 2008 SCC applied clothianidin to genetically engineered cotton seeds in California.

3

f.  SCC's clothianidin field testing from 2005 – 2007 cost SCC several million dollars.

g.  SCC's commercial clothianidin products will be called NipsIt INSIDE® and NipsIt INSIDE Poly.  SCC has applied to the United States Patent and Trademark Office for trademark protection for the product names NipsIt and NipsIt INSIDE.

h.  SCC prepared and submitted a pesticide registration to the U.S. Environmental Protection Agency ("E.P.A.") pursuant to the Federal Insecticide Fungicide and Rodenticide Act to authorize SCC's clothianidin seed treatment business.  SCC began preparing its first registration in the first quarter of 2006, submitted it in September 2007, and the registration was approved in February 2008.  SCC intends to submit additional registrations to the E.P.A.  SCC has already prepared and filed state pesticide registrations in 10 states for the same reasons as the federal registration.

i.  SCC has contracted with Helena Industries, Inc. in Cordele, Georgia to formulate various clothianidin finished products for treatment of seeds, including seeds of genetically engineered plants.

j.  SCC has met with more than ten prospective U.S. customers for its clothianidin products to offer an alternative source of supply, as opposed to Bayer's clothianidin products.  SCC has already lost at least one significant prospective customer in the U.S., after having negotiated the key commercial terms, because the customer was uncertain about SCC's freedom to operate in view of U.S. Patent No. 7,105,469 ("the '469 patent"), which I understand is owned by Syngenta and is the patent at issue in this litigation.

II.  **SCC'S DISCUSSIONS WITH SYNGENTA AND BAYER**

12.  As described more fully below, SCC has unsuccessfully attempted to obtain a license for the use of clothianidin with genetically engineered plants and their seeds from Syngenta Crop Protection, Inc. ("Syngenta") under Syngenta's '469 patent.

13.  Syngenta and Bayer both sell neonicotinoid insecticide products in the U.S. for treatment of seeds, including seeds of genetically engineered plants.  Syngenta sells neonicotinoid insecticide products which have thiamethoxam as their listed active ingredient. Bayer sells neonicotinoid insecticide products which have clothianidin as their listed active ingredient.  SCC's clothianidin

4

1   treatments would compete primarily with Syngenta's thiamethoxam and Bayer's clothianidin

2   products.

3       14.  SCC learned that the '469 patent had issued on September 12, 2006.  SCC was surprised

4   that the PTO allowed the '469 patent to issue.

5       15.  I am informed that on October 30, 2006, SCC met with Syngenta in Japan. At this

6   meeting, SCC requested more information about the '469 patent and told Syngenta that it was in the

7   process of setting up a seed treatment business.  Syngenta agreed to provide information about the

8   '469 patent, but Syngenta did not disclose any license agreements it might have had.

9       16.  I am informed that SCC met with Syngenta to investigate obtaining a license under the

10  '469 patent on February 1, 2007.  At this meeting, Syngenta told SCC that it had a co-exclusive

11  license arrangement with Bayer for the '469 patent.  Syngenta stated that it could not grant a license

12  without the express consent of Bayer and told SCC to contact Bayer directly about obtaining consent

13  to a license.

14      17.  I am informed that six days later, on February 7, 2007, SCC met with Bayer in Germany.

15  Bayer told SCC to negotiate directly with Syngenta for a license under the '469 patent.

16      18.  I am informed that on March 7, 2007, SCC met again with Syngenta, and Syngenta

17  stated its belief that the '469 patent was valid.  Syngenta asked SCC to propose terms for a potential

18  license, even though Syngenta maintained that it needed Bayer's consent in order to grant a license.

19  Syngenta confirmed this request in an April 2, 2007 letter, a true and correct copy of which is

20  attached to this declaration as Moriya Exhibit 1.  Specifically, Syngenta requested the following

21  information from SCC: i) the patent(s) included; ii) the territory covered by the proposed license; iii)

22  the activity or field of use; iv) the term of the proposed license; v) the royalty rate which SCC would

23  offer to pay; vi) the scope of any sub-licenses; vii) and any other material terms requested.

24      19.  On March 30, 2007, SCC wrote a letter to Syngenta affirming its commitment to

25  obtaining a license to the '469 patent.  A true and correct copy of this letter is attached to this

26  declaration as Moriya Exhibit 2.  On April 23, 2007, SCC wrote a letter to Syngenta and proposed

27  terms for a potential license.  A true and correct copy of this letter is attached to this declaration as

28  Moriya Exhibit 3.  SCC never received a response to these proposed terms.

5

SUPPORTING DECLARATION OF MOTOHARU MORIYA                Case No. 08-CV-0720 VRW

20. I am informed that on May 3, 2007, SCC had a conference call with Bayer in which Bayer stated that it had paid a very large sum of money to Syngenta for its '469 license and therefore would not unconditionally support a license to SCC. Bayer has never proposed any terms or conditions for such a license.

21. Syngenta expressly threatened a patent infringement lawsuit against SCC on June 12, 2007, when SCC representatives, including myself, met with Robert Durand of Syngenta, in Basel, Switzerland. During the course of the meeting, I asked Mr. Durand what Syngenta would do if SCC entered the U.S. with clothianidin for treatment of genetically engineered plants or their seeds. Mr. Durand stated that Syngenta would enforce the '469 patent. I understood the remark to mean that Syngenta would file a patent infringement lawsuit under the '469 patent against SCC if it entered the U.S. with clothianidin treatments for genetically engineered plants or their seeds. Syngenta also re-affirmed its belief that the '469 patent is valid and told SCC that it had not yet secured Bayer's consent to grant a license to SCC.

22. At a meeting on June 14, 2007, Bayer told SCC that it already had a co-exclusive license with Syngenta that it did not want to change and that any decision to consent to a license for SCC would have to be made by Bayer's board.

23. On July 31, 2007, SCC received a letter from Syngenta which said that "Syngenta is confident that clothianidin for foliar applications will not be used on/sold for use on transgenic crops." A true and correct copy of this letter is attached as Moriya Exhibit 4. SCC interpreted this statement as a threat of a patent infringement lawsuit, because SCC had been telling Syngenta for almost a year that those were SCC's plans to develop and sell clothianidin in the U.S. for insect control in plants, including genetically engineered plants.

24. On August 3, 2007 SCC again met with Bayer. Bayer told SCC that the '469 agreement cannot be separated from other contracts between Syngenta and Bayer. Bayer also told SCC that no one in Bayer thinks that it is necessary to give away its '469 license because Bayer paid a great amount of money for the license. During the meeting SCC understood that the message from Bayer was that Bayer did not want SCC to enter the seed treatment business.

25. On August 11, 2007 SCC and Syngenta again met, and Syngenta told SCC that it did not

6

1    want to see any new entrant in the U.S. seed treatment business.

2          26.  On October 19, 2007, SCC met with Syngenta and explained that although SCC

3    preferred a business solution, it was preparing to file suit to invalidate the '469 patent.  Syngenta

4    stated that there was nothing more it could do with Bayer because talks between top executives did

5    not work.

6          27.  To summarize, the license discussions that extended for over one year were fruitless and

7    futile.  No additional license discussions between SCC and either Syngenta or Bayer are planned, as

8    that potential avenue of resolution of this controversy is exhausted.

9          28.  Based upon the information available to SCC, it is SCC's understanding that Syngenta

10   never attended a meeting with SCC and Bayer to discuss the '469 patent.

11         29.  Based upon the information available to SCC, it is SCC's understanding that SCC was

12   never provided a copy of the license for the '469 patent that Syngenta alleges it has with Bayer.  The

13   details of the license were not provided to SCC, but the license has been described as co-exclusive.

14         30.  SCC needs a declaration of its legal rights under the '469 patent to resolve a dispute

15   between the parties as to whether or not the '469 patent validly blocks SCC's ability to sell

16   clothianidin treatment in the U.S. for genetically engineered plants and their seeds.  Since the

17   relevant seed treating and planting seasons are limited, even just a few months delay can potentially

18   delay the introduction of Plaintiffs' products for an additional year.

19         31.  Selling clothianidin in the U.S. for genetically engineered plants and their seeds is

20   extremely important to SCC.  In 2006 U.S. sales of clothianidin for treatment of seeds of genetically

21   engineered plants was more than $161 million.

22         32.  SCC's field testing was designed to determine the proper concentrations and

23   formulations of clothianidin for use on genetically engineered plants and their seeds for insect

24   control under different planting conditions.  The chemical nature of clothianidin itself is fixed.  This

25   same chemical has been used in every one of SCC's field tests and will be present in every product

26   SCC intends to sell for use on plants and seeds, including genetically engineered plants and their

27   seeds.

28

SUPPORTING DECLARATION OF MOTOHARU MORIYA    Case No. 08-CV-0720 VRW

1    I hereby declare under penalty of perjury under the laws of the United States of America that

2    the foregoing is true and correct. Executed on June 12, 2008.

3

4    _____
     MOTOHARU MORIYA

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SUPPORTING DECLARATION OF MOTOHARU MORIYA                    Case No. 08-CV-0720 VRW

# EXHIBIT 1
# FILED UNDER SEAL

# EXHIBIT 2
# FILED UNDER SEAL

# EXHIBIT 3
# FILED UNDER SEAL

# EXHIBIT 4
# FILED UNDER SEAL