In anticipation of those sales, in 2005 Plaintiffs began field testing clothianidin on seeds, including seeds of genetically engineered plants in the United States. Moriya Decl. at ¶ 11; Complaint ¶ 29. Field testing involves formulation and application of clothianidin to selected seeds and plants, including genetically engineered plants and their seeds, in selected parts of the United States. A complete cycle for field test typically takes seed companies two years. Moriya Decl. at ¶ 10. SCC's field testing effort encompassed five crops in twenty-four states. *Id.* at ¶ 11 This field testing effort has already cost SCC several million dollars. Moriya Decl. at ¶ 11f.[2]

In addition to conducting field tests in preparation for entering the seed treatment market, SCC has also invested in acquiring trademark protection for its commercial clothianidin products. For example, SCC's commercially available clothianidin will be marketed as NipsIt INSIDE and NipsIt INSIDE Poly. Moriya Decl. at ¶ 11g.

In further preparation for entering the clothianidin seed treatment business, SCC submitted a pesticide registration with the U.S. Environmental Protection Agency ("E.P.A.") pursuant to the Federal Insecticide Fungicide and Rodenticide Act, to authorize its clothianidin seed treatment business. SCC began preparing this registration in the first quarter of 2006; submitted it in September 2007, and received E.P.A. approval in February 2008. SCC has also prepared and filed similar state pesticide registrations in 10 states. Moriya Decl. at ¶ 11h.

SCC has also contracted with business partners in preparation to enter the seed treatment business. For example, SCC contracted with Helena Industries, Inc. in Cordele, Georgia to make SCC's clothianidin products for sale and use on plants and seeds, including genetically engineered plants and seeds. Moriya Decl. at ¶ 11i.

SCC has also met with more than ten prospective customers in preparing to sell clothianidin in the U.S. As a direct result of the present patent conflict with Syngenta, SCC recently lost one significant prospective customer in the U.S. After having negotiated the key commercial terms of a contract with SCC, that customer decided not to do business with SCC due to the uncertainty

---

[2] Syngenta asserts that its '469 patent covers the use of clothianidin on genetically engineered plants and their seeds. Moriya Decl. at ¶ 21; *see also* July 31, 2007 Letter from Durand to Shinkai at ¶ 4, a true and correct copy of which is attached as Moriya Exhibit 4. Thus, Syngenta may accuse Plaintiffs' past and ongoing field testing of infringing the '469 patent.

3

"inconsistency" was typical of both Syngenta's and Bayer's responses to SCC's good faith attempts to undertake licensing discussions. *See e.g.,* Moriya Decl. at ¶ 18.

At a March 7, 2007 meeting, Syngenta's attorneys explained that SCC needed to submit a formal request letter so that Syngenta could consider all of the legal issues regarding such a license and could seek Bayer's consent. Moriya Decl. at ¶ 18. Specifically, Syngenta requested the following information from SCC: i) the patent(s) included; ii) the territory covered by the license; iii) the activity or field of use; iv) the term of the license; v) the royalty rate which SCC would offer to pay; vi) the scope of any sub-licenses; vii) and any other material terms requested. Moriya Decl. at ¶ 18; Moriya Exhibit 1. SCC promptly complied with this request by letters dated March 30, 2007 and April 23, 2007. *See* Moriya Exhibits 2 and 3. Syngenta has never responded in writing to SCC's formal request for a license.

The parties met again on June 12, 2007 at Syngenta's offices in Switzerland. At that meeting, after SCC had again flown across the globe in hopes of securing a license, Syngenta informed SCC that it had not yet secured Bayer's consent to license SCC under the '469 patent. SCC asked Syngenta what it would do if SCC started its U.S. Clothianidin business for use on genetically engineered crops without securing a license under the '469 patent, and Syngenta replied that it would enforce its '469 patent against SCC. Moriya Decl. at ¶ 21. Thus, in June 2007, SCC was told by Syngenta that if it did sell clothianidin for seed treatment of genetically engineered plants without a license, it would be sued for patent infringement.

In late July 2007, Syngenta wrote that it was still unable to obtain Bayer's consent to license SCC under the '469 patent. Syngenta also informed SCC that although it was "continuing its efforts," "there are various limits on what we can do" and that it was "of course unable to predict any particular outcome." *See* Moriya Exhibit 4. In that same letter, Syngenta again made very clear that Plaintiffs could not sell clothianidin for use on genetically engineered plants or their seeds. *Id.*

Thus, on the one hand, Syngenta tried to create the impression that it was cooperating with SCC in seeking Bayer's consent for a license, and on the other hand, Syngenta threatened SCC with a patent infringement lawsuit if it carried out its intended business activities without a license.

Syngenta laid aside all pretense on August 11, 2007 when it told SCC that it did not want to

5